UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO. 07-235 (DWF/JSM)

     Plaintiff,

v.                                           REPORT AND RECOMMENDATION


MOHAMMED HADI AL JEBORY (1),
and AHMED HADI AL JEBORY (2),

     Defendants.


JANIE S. MAYERON, United States Magistrate Judge

The above matter came on before the undersigned upon defendant Mohammed Hadi Al Jebory's motions to Suppress Confessions and Statements in the Nature of Confessions [Docket No. 19] and to Suppress Evidence Obtained by Search and Seizure [Docket No. 27]; defendant Ahmed Hadi Al Jebory's motions to Suppress Statements [Docket No. 33] and for Suppression of Search and Seizure Evidence [Docket No. 41];[1] and Defendants' Joint Motion for Franks Hearing [Docket No. 55].[2]

Tracy L. Perzel, Assistant United States Attorney, appeared on behalf of the United States of America; Douglas A. Myren, Esq. appeared on behalf of defendant

---

[1]    In the Court's Electronic Court Filing (ECF) system, there is a notation to Docket No. 41 which states that the Motion for Suppression of Search and Seizure Evidence was filed in error and would be re-filed. It does not appear as though the motion was ever re-filed, but since the motion is obtainable from ECF and was properly served upon the Government and provided to the Court, the Court will refer to that motion as being found at Docket No. 41.

[2]    At the end of the motions hearing, defendants also moved for disclosure of the rough notes that were used for preparation by testifying witness Agent Scott Robinson. The Court has addressed that motion in an Order issued in conjunction with this Report and Recommendation.

Mohammed Hadi Al Jebory, who was personally present; and Thomas G. Dunnwald, Esq. appeared on behalf of Ahmed Hadi Al Jebory, who was personally present. The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

Based upon the pleadings, the pre-hearing submissions, exhibits submitted at the Franks hearing on September 19 and 20, 2007, and testimony taken from Agent Jesse Cordova, Officer Andrew Devinny, and Agent Scott Robinson, it is recommended that (1) defendant Mohammed Hadi Al Jebory's motions to Suppress Confessions and Statements in the Nature of Confessions [Docket No. 19] and to Suppress Evidence Obtained by Search and Seizure [Docket No. 27], be DENIED; (2) defendant Ahmed Hadi Al Jebory's motions to Suppress Statements [Docket No. 33] and for Suppression of Search and Seizure Evidence [Docket No. 41] be DENIED; and (3) Defendants' Joint Motion for Franks Hearing [Docket No. 55] be GRANTED.[3]

## I.    FACTUAL BACKGROUND

Agent Scott Robinson is currently assigned to the South Central Drug Investigation Unit as a task force agent.    Tr. 2:92.[4]    Agent Robinson received

---

[3]    The joint motion for a Franks hearing was unopposed by the Government.  See Gov't Response to Defs'. Motion for Franks Hearing, p. 6 [Docket No. 61]; September 19, 2007 hearing transcript, p. 6; Gov't Post-Hearing Omnibus Response, p. 1 [Docket No. 83].  Accordingly, the Court held the Franks hearing in conjunction with the hearing on the motions on September 19 and 20, 2007.

[4]    The transcript citations referenced in this decision are formatted with the number of the volume of the transcript listed first, followed by the page number.  Thus, the September 19, 2007 hearing transcript is labeled as Volume 2, and the September 20, 2007 hearing transcript is labeled as Volume 3.  The hearing on September 17, 2007 (Volume 1) dealt only with the arraignment and non-dispositive motions of Mohammed Al Jebory, and is not germane to the matters referenced in this Report and Recommendation.

information regarding possible drug-related activity at XXX Frank in Faribault, Minnesota, involving Michael Gannaway, Shawn Williams and Tessa Brockmiller. Tr. 2:100-101. On January 15, 2007, there was a report of shots fired at the residence. Tr. 2:101. As a result of the shooting, the Faribault Police Department executed a search warrant on this residence on January 20, 2007. Tr. 2:102, 3:23. Agent Robinson was present when the warrant was executed. Tr. 2:103. During the search, officers found, among other things, a cigarette box containing controlled substance paraphernalia, including a snort tube that field-tested positive for cocaine, and a baggie containing a small quantity of a substance that also tested positive for cocaine. Tr. 2:103-104, 3:24. As a result, Gannaway was arrested and held on probable cause. Tr. 2:104. Gannaway's case was referred to the county attorney's office to consider for charging. Tr. 2:105. Prior to his release from the probable cause hold, Agent Robinson approached Gannaway regarding the possibility of working as a confidential informant and gave Gannaway his cell phone number. Tr. 2:106. On January 25, 2007, Gannaway contacted Agent Robinson, and ultimately signed on with the task force as a confidential informant. Tr. 2:107. Gannaway was registered as working for consideration of charges and for cash. Tr. 2:108. As the result of his arrest, Gannaway was eventually charged with a fifth-degree controlled substance crime, which was dismissed as the result of his cooperation in the present case. Tr. 3:25, 3:28.

On January 27, 2007, Agent Robinson met with Gannaway, and Gannaway provided him with information regarding controlled substance dealing in Faribault. Tr. 2:113. Gannaway told Agent Robinson that a person by the name of "Mo", who lived at XXX 6th Street N.W. in Faribault, dealt cocaine; that Mo's brother, "AJ", who lived at

XXXX Central Avenue, in Faribault, dealt cocaine with Mo; and that in their dealings they used two vehicles with license plate numbers FDS-XXX and PBP-XXX. Tr. 2:113. Gannaway also gave to Agent Robinson information regarding a vehicle with license plate number UDB-XXX, which was parked in the garage at the 6th Street N.W location. Tr. 2:121. Agent Robinson ran the vehicle history on license plate number UDB-XXX, and determined that it was registered to Ahmed Hadi Al Jebory at the Central Avenue address. Tr. 121. Based upon that information, Agent Robinson obtained a photograph of Ahmed from Minnesota Driver and Vehicle Services (DVS). Tr. 2:121.

On January 27, 2007, Gannaway arranged to make a controlled substance purchase of cocaine by calling the cell phone identified by Gannaway as Mo's cell phone – i.e., the cell phone used to contact Mo. Tr. 2:113-14. Gannaway made the call to set up the deal outside the presence of Agent Robinson. Tr. 2:114. Agent Robinson then met Gannaway at a predetermined location, and Gannaway made another call to Mo's cell phone and spoke with a person named Ismail. Tr. 2:115. The nature of the deal was that Gannaway was going to purchase an eighth of an ounce of cocaine from AJ or Ismail for $180 and Mo was going to do the deal. Tr. 2:115. However, because Mo was sleeping, Ismail said that he would do the deal at the Central Avenue address. Tr. 2:116; Defs' Ex. 15 (Transcript of January 27, 2007 Debrief Tape) at p. 2. Gannaway then received a call from AJ while in the presence of Agent Robinson. Tr. 2:115. AJ changed the meet location to Walgreen's in Faribault. Tr. 2:116; Defs' Ex. 2.

In preparation for the controlled buy, Agent Robinson searched Gannaway's vehicle and Gannaway, and provided him with $200 in prerecorded government funds and a small digital tape recorder. Tr. 2:116-117. Agent Robinson then followed

Gannaway to the meet location. Tr. 2:117. As Gannaway turned into the Walgreen's parking lot, a dark-skinned male walking toward the front of the store motioned to Gannaway where to park in the lot. Tr. 2:117. At that time, Agent Robinson did not know identity of the male. Tr. 2:117-118. Agent Robinson then observed activity that was consistent with a drug deal and that which Gannaway described to him in the subsequent debriefing: he saw a tall, thinner, dark skinned male wearing a jacket and sunglasses get into the passenger side of Gannaway's vehicle, remain there for approximately one minute and then exit the vehicle and walk to a different vehicle. Tr. 2:118-120. As Agent Robinson left the parking lot, he observed that this other vehicle had the license plate PBP-XXX, which was one of cars previously described by Gannaway as associated with defendants. Tr. 2:119.

During the debriefing, Gannaway identified AJ as the person who motioned to him where to park in the lot, and Ismail as the person who walked over to his car, got in and did the transaction. Gov't Ex. 1, ¶ 3; Gov't Ex. 2, ¶ 3[5]; Defs' Ex. 15 at p. 3. Agent Robinson field-tested the purchased substance, and it tested positive for cocaine. Tr. 2:120. Agent Robinson observed that the cocaine was in chunks, which indicated to him that it had been cut from a larger block. Tr. 2:120.

On January 28, 2007, Agent Robinson learned after speaking with Gannaway that Ismail's full name was Warsame Hussein Ismail. Tr. 2:122. Agent Robinson then ran Ismail's record in DVS, and obtained his photograph. Tr. 2:122.

---

[5]     For the convenience of the Court and parties, the Government numbered the paragraphs setting forth the facts in the affidavits that accompanied the search warrants for the Central Avenue and 6th Street N.W. search warrants. See Gov't Exs. 1 and 2.

On January 29, 2007, Gannaway called Mo's cell phone again to arrange to purchase an eighth of an ounce of cocaine for $180. Tr. 2:126. AJ answered the phone. Gov't Ex. 1, ¶ 6; Gov't Ex. 2, ¶ 6. On this occasion, the call was recorded. Tr. 2:127. Gannaway and Agent Robinson met at a predetermined location, Agent Robinson gave Gannaway recording equipment, and Gannaway called Mo's phone, spoke to a male, and confirmed that the deal was still on. Tr. 2:127. In preparation for the controlled buy, Agent Robinson documented the money, provided the wire and searched Gannaway and his car. Tr. 2:128. Agent Robinson then followed Gannaway to Walgreen's, where he observed a male, who appeared to be the same male who was wearing sunglasses at the first controlled buy, get out of a maroon Lumina and get into Gannaway's vehicle. Tr. 2:127-129. Agent Robinson's observations of the activity were consistent with a drug deal, Gannaway's debriefing was consistent with Agent Robinson's observations, and the wiretap reflected the transaction. Tr. 2:129. Gannaway told Agent Robinson that Ahmed was driving the maroon Lumina, and that Ismail was the passenger in the car. Tr. 2:129. The Lumina had the license plate number FDS-XXX, and was registered to Ahmed Al Jebory. Tr. 2:130.

Gannaway had told Agent Robinson that Mo was Ahmed's older brother. Tr. 2:131. Upon performing a DVS check, Agent Robinson found an entry for Mohammed Hadi Al Jebory, who was two years older than Ahmed. Tr. 2:131. Based upon the similarity in names and the information he had been given, Agent Robinson believed that the Mohammed Al Jebory he found in DVS was Ahmed Al Jebory's older brother. Tr. 2:131.

On January 29, 2007, Agent Robinson showed the DVS photographs of Ahmed Al Jebory and Warsame Ismail to Gannaway, who identified Ismail as "Ish" and Ahmed as "AJ." Tr. 2:131.

Agent Robinson observed the vehicle involved in the controlled buy on January 27, 2007, PBP-XXX, to be parked at the addresses of Mohammed and Ahmed Al Jebory. Tr. 3:76.

On February 2, 2007, Agent Robinson received an anonymous phone call from an unidentified person who sounded African and male. Tr. 2:132-133. The call was transferred to Agent Robinson by dispatch. Tr. 2:133. The caller told Agent Robinson that he had been at Mo's house in Faribault, and while he was there he had observed a large amount of cocaine and cash and guns. Tr. 2:133. Agent Robinson was under the impression that the information had been obtained within the past two days. Tr. 2:133. The caller did not seek anything in return for providing the information. Tr. 2:134. Agent Robinson asked to meet the caller in person. Tr. 2:134. The caller did not want to come to Faribault because he was afraid of Mo and AJ, and they settled on meeting at the Mall of America later that same day. Tr. 2:134. Agent Robinson testified that did not know the identity of the caller prior to the meeting. Tr. 2:134.

Agent Jesse Cordova, another task force agent of the South Central Drug Investigation Unit, accompanied Agent Robinson to the meeting at the Mall of America for the purpose of doing countersurveillance and for officer safety. Tr. 2:13, 31, 33. Agent Robinson and Agent Cordova sat down with the caller, and Agent Robinson recognized him as Warsame Ismail from his DVS picture; as such, he assumed that he was the same person known as "Ish" who was involved in the two controlled buys. Tr.

2:136.  During the meeting, Ismail told the agents that he had been at AJ's apartment and observed 1 to 2 grams of cocaine, and what he thought to be a sawed-off shotgun. Tr. 2:136.  He also told the agents that AJ was a snorter and that he pinched, meaning that he was a dealer who took some of the product for himself when dealing.  Tr. 2:136-137.  Ismail was able to identify AJ as Ahmed Hadi Al Jebory, and knew his first, middle and last names.  Tr. 2:137.  Ismail also told the agents that at Mo's house there was 100 grams of cocaine, if not more, in chunks in a plastic bag, a large amount of cash that was between ten and fifteen thousand dollars, a stolen Harley Davidson parked in the living room, and handguns.  Tr. 2:137.  He said that the cocaine could be found in the top drawer in the kitchen.  Tr. 2:138.  Ismail and the agents also discussed what Ismail was looking for in exchange for the proffered information.  Tr. 2:138.  Ismail was seeking expungement, and had some things open in Wright County and Hennepin County.  Tr. 2:138.

Agent Robinson told Ismail that he could not do anything with another jurisdiction's case, but that he would check into it, and also spoke with him about being compensated.  Tr. 2:139.  Agent Robinson was authorized to offer ten percent of any cash seized as payment.  Tr. 2:139-140.  The agents asked Ismail if he would be willing to show them the houses that were involved and he agreed.  Tr. 2:140.  Agents Robinson and Cordova then drove Ismail down to Faribault, and Ismail showed them the XXXX Central and XXX 6th Street N.W. locations where the drug-dealing activity was taking place.  Tr. 2:140.  Ismail never gave any indication that he was aware that the controlled buys had occurred and involved him.  Tr. 2:141.

Agent Robinson remained in Faribault to prepare the search warrant, and Agent Cordova gave Ismail a ride back to the Twin Cities. Tr. 2:140. Agent Robinson believed that he needed to act quickly in obtaining the search warrants because of the significant amount of cash and cocaine involved, which could be sold. Tr. 3:150.

Agent Robinson testified that he felt that Ismail's information was accurate and specific. Tr. 2:142. He talked about the Harley, the cocaine being in chunks, the weight of the cocaine and the cash. Tr. 2:143. In addition, while Ismail was afraid of the defendants, he was able to point out the houses where they lived. Tr. 2:142. When asked what Ismail was afraid of, Agent Robinson testified that Ismail said that the defendants were gang-affiliated, and that Mohammed had nearly shot somebody in a dispute outside of a bar in Faribault. Tr. 2:142. Agent Robinson believed Ismail's fear to be genuine because he crouched down in the car as they drove past the residences. Tr. 2:143.

Agent Cordova was present for the execution of the warrant at XXX 6th Street N.W. Tr. 2:18. Once inside the residence, Agent Cordova went to a drawer in the kitchen where Ismail had told Agent Robinson cocaine could be found. Tr. 2:18, 2:28, 2:37. Upon opening the drawer, Agent Cordova observed a substance he believed to be cocaine. Tr. 2:18-19.

Agent Cordova saw Ahmed and Mohammed at the 6th Street N.W. residence, along with a juvenile child and an adult female. Tr. 2:19. It appeared as though they had been painting the walls of the living room. Tr. 2:22. Nothing about the appearance of Ahmed or Mohammed gave Agent Cordova the impression that they were under the influence of drugs or alcohol. Tr. 2:20. Although alcohol bottles and cocaine were

found in the living room of XXX 6th Street N.W., Agent Cordova was not able to determine how recently they had been used.  Tr. 2:54.

Officer Andrew Devinny of the Owatonna Police Department also participated in the execution of the search warrant at XXX 6th Street N.W. on February 2, 2007.  Tr. 2:68.  Officer Devinny was assigned to the entry team for that residence.  Tr. 2:69. Officer Devinny testified although he wore a mask, helmet and protective goggles to enter the residence, he still had the ability to smell.  Tr. 2:71.  He did not recall smelling any specific odor at XXX 6th Street N.W.  Tr. 2:71.  After entering the residence, Officer Devinny found Mohammed on the upper level staircase.  Tr. 2:72.  Officer Devinny gave Mohammed commands, which he followed, and Mohammed did not appear confused or incapable of understanding Officer Devinny's instructions.  Tr. 2:72.  After clearing the upstairs, Officer Devinny escorted Mohammed downstairs.  Tr. 2:73.  Mohammed did not appear to be under the influence of alcohol or other drugs.  Tr. 2:74.  Officer Devinny stayed with Mohammed until Agent Robinson arrived.  Tr. 2:74.  During that time, he did not question Mohammed.  Tr. 2:74-75.  Once Agent Robinson arrived, Mohammed was advised by Agent Robinson that he was under arrest for possession of narcotics.  Tr. 2:75.  It did not appear to Officer Devinny as though Agent Robinson was interrogating Mohammed; rather it appeared that Agent Robinson was informing Mohammed of the circumstances.  Tr. 2:76.

Agent Robinson participated in the execution of both warrants.  Tr. 2:149-150. He initially began at the Central Avenue address, and then proceeded to the 6th Street N.W. address.  Tr. 2:150.  Upon arriving at the 6th Street address, he examined the quantity of cocaine found by Agent Cordova in the kitchen and observed it to be at least

three ounces and in a couple of big blocks or chunks. Tr. 2:150. He weighed and field-tested the substance, and it tested positive for cocaine. Tr. 2:150. Agent Robinson then walked into the living room and observed that defendants and Mohammed's girlfriend and child were there. Tr. 2:151. He approached Mohammed, identified himself, explained that they had found 80 to 81 grams of cocaine in the residence and that he was placing him under arrest for a first-degree controlled substance crime. Tr. 2:151. Agent Robinson did not question Mohammed. Tr. 2:151. However, after Agent Robinson advised him that he was under arrest, Mohammed blurted out that the cocaine was his and not his brother's. Tr. 2:151. Agent Robinson testified that he did not expect Mohammed to respond to being informed that he was under arrest, and his advisement that Mohammed was under arrest was not designed to elicit an incriminating response. Tr. 3:82, 3:144. Mohammed did not appear to be operating under any mental or physical condition that indicated that he did not understand Agent Robinson. Tr. 2:151. Agent Robinson did not threaten Mohammed. Tr. 2:152.

Agent Robinson placed everyone under arrest and they were transported from the residence to the jail. Tr. 2:152.

After the execution of the warrants was completed, Agent Robinson went to the Rice County jail to interview Mohammed and Ahmed. Tr. 2:152. The booking process at the Rice County jail included questions and observations made by the booking officer regarding the condition of individuals. Tr. 2:153. Both Ahmed's and Mohammed's questionnaires indicated that neither appeared to be under the influence of alcohol or drugs. Tr. 2:154; Gov't Exs. 3, 6.

Mohammed was interviewed first.[6]   Tr. 2:155.   Immediately following the interview of Mohammed, Agents Robinson and Cordova completed the interview with Ahmed.   Tr. 2:161; Gov't Exs. 7, 8.   That interview was taped, and no conversations were held off tape.   Tr. 2:161.   The interview of Ahmed was conducted in a small square room at the Rice County Jail. Tr. 2:155; 2:162.   The interview lasted approximately thirteen minutes.   Tr. 2:162.   Ahmed was handcuffed.   Tr. 2:162.

Prior to beginning the interview of Ahmed, Agent Robinson administered <u>Miranda</u> warnings.   Tr. 2:163; Gov't Ex. 7; Gov't Ex. 8, p. 1.   Ahmed indicated he understood his rights and agreed to speak to the agents regarding his case.   Gov't Ex. 7; Gov't Ex. 8, pp. 1-2.   During the interview, Ahmed made no complaints regarding his physical condition, and there was nothing to give Agent Robinson pause with respect to his mental condition.   Tr. 2:163.   He did not appear to be under the influence of drugs or alcohol.   Tr. 2:163.   Ahmed appeared to understand English, did not need a translator, and never asked for a translator.   Tr. 2:163.   At one point during the interview, Agent Robinson began listing specific places to which he knew drugs had been delivered, and Ahmed became quiet.   Tr. 2:164; Gov't Ex. 7; Gov't Ex. 8, pp. 4-5.   When Agent Robinson remarked on his becoming quiet, Ahmed said that he had no more to say.   Tr. 2:164; Gov't Ex. 7; Gov't Ex. 8, pp. 4-5.   Agent Robinson interpreted that to mean that Ahmed was uncomfortable with that particular line of questioning and the specificity of the locations.   Tr. 2:164.   Agent Robinson did not believe that he needed to clarify Ahmed's statement, and felt that Ahmed just did not want to discuss the fact that those

---

[6]      As Mohammed is only seeking to suppress the statements he made at the interview on grounds that they were the fruit of an unlawful search, the facts developed by the parties surrounding his interview will not be described here.   <u>See</u> Mohammed's Post-Hearing Brief, pp. 25-26.

locations were used for drug dealings. Tr. 2:165. Agent Robinson kept talking about something else, and the interview moved on. Tr. 2:165; Gov't Ex. 7; Gov't Ex. 8, pp. 5-9.

Ahmed never made any complaints during his interview with respect to his physical condition, and there was no indication that he was operating under any kind of mental deficiency. Tr. 2:57. Ahmed did not appear too tired to go forward with the interview, and never mentioned being tired. Tr. 2:57-58. Agent Cordova testified that both defendants spoke English very well, and that he did not know whether English was their second language. Tr. 2:58. Nothing about their responses indicated that they did not understand communications in English. Tr. 2:58.

## II. ANALYSIS

### A. <u>Motions to Suppress Evidence</u>

Initially, both defendants challenged the search and seizure of evidence from the Central Avenue and 6th Street N.W. residences on grounds that the search warrants for these locations were obtained on the following grounds: the warrants were obtained by fraud, gross and reckless misrepresentations and other outrageous Government conduct; the warrants were obtained and executed in an unlawful manner; and the warrants were issued without sufficient probable cause based on inadequate and inaccurate affidavits. <u>See</u> Mohammed Motion to Suppress Evidence Obtained by Search and Seizure [Docket No. 27]; Ahmed Motion for Suppression of Search and Seizure Evidence [Docket No. 41]. Defendants have now confined their suppression motions to the contention that the evidence obtained from these locations should be suppressed because the search warrants were issued in violation of the principles set

forth in <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).  <u>See</u> Ahmed's Post-Hearing Mem. [Docket No. 78]; Mohammed's Post-Hearing Mem. [Docket No. 79].

Ordinarily, searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit.  <u>Illinois v. Gates</u>, 462 U.S. 213, 236 (1983).  "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."  <u>United States v. Fladten</u>, 230 F.3d 1083, 1085 (8th Cir. 2000).

The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  <u>Gates</u>, 462 U.S. at 238.

When informants are used to develop probable cause to support the issuance of a search warrant,

> [t]he core question . . . is whether the information is reliable. Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence.  <u>Draper v. United States</u>, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959) (<u>Draper</u>). If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable. <u>Gates</u>, 462 U.S. at 233-34, 103 S.Ct. at 2329-30; <u>Draper</u>, 358 U.S. at 313, 79 S.Ct. at 333.

<u>United States v. Williams</u>, 10 F.3d 590, 594 (8th Cir. 1993).

In reviewing the decision of the court issuing the search warrant, the duty of the reviewing court is simply to ensure that the issuing court had a substantial basis for

concluding that probable cause existed. Id. at 238-39 (citation omitted). "A facially sufficient affidavit, however, may be challenged on the ground that it includes deliberate or reckless falsehoods, Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and this rule has been extended to allow challenges to affidavits based on alleged deliberate omissions. E.g., United States v. Dennis, 625 F.2d 782 (8th Cir.1980)." United States v. Reivich, 793 F.2d 957, 960 (8th Cir. 1986).[7]

Thus, the issue before this Court is whether defendants have established by a preponderance of evidence that a Franks violation has occurred, i.e., whether Agent Robinson (1) knowingly and intentionally, or with reckless disregard for the truth, included false information in or excluded material information from the search warrant affidavits; and if so, whether (2) the affidavits, excluding the false statements or including the missing material information, would not support a finding of probable cause. See Franks, 438 U.S. at 156-56; Williams, 477 F.3d at 557 (citations omitted), United States v. Davis, 471 F.3d 938, 946 (8th Cir. 2006) (citations omitted); United States v. Clapp, 46 F.3d 795, 799 (8th Cir. 1995) (citations omitted).

---

[7]     In the normal course of events, before defendants can obtain an evidentiary hearing ("Franks hearing") to determine whether to invalidate a search warrant, they must make a substantial preliminary showing through an offer of proof (in the form of supporting affidavits or similarly reliable statements) that: (1) the affidavits supporting the search warrant contain false information or an omission that was intentionally or recklessly excluded; and (2) deletion of the false information and inclusion of the omitted information negates a finding of probable cause. See United States v. Williams, 477 F.3d 554, 558 (8th Cir 2007). Allegations of negligence or innocent mistake are insufficient to warrant a Franks hearing. Id. citing to Franks, 438 U.S. at 171. In this case, without conceding whether defendants had made the requisite substantial preliminary showing to justify a Franks hearing, the Government agreed to such a hearing. See Tr. 2:6; Gov't Response to Defs'. Motion for Franks Hearing, p. 6 [Docket No. 61]; Gov't Post-Hearing Omnibus Response, p. 1 [Docket No. 83]. Consequently, the Court held a Franks hearing on September 19 and 20, 2007, without reaching the question of whether defendants had met the required preliminary showing that they were entitled to the hearing.

The test for determining whether an affiant's false statements were made with reckless disregard for the truth is "whether, viewing all of the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." Clapp, 46 F.3d at 801. (citation omitted). With respect to omissions, "'recklessness may be inferred from the fact of omission of information from an affidavit ... only when the material omitted would have been 'clearly critical' to the finding of probable cause.'" Williams, 477 F.3d at 559 (citation omitted); United States v. Ozar, 50 F.3d 1440, 1445 (8th Cir. 1995) (quoting Reivich, 793 F.2d at 961); United States v. Flagg, 919 F.2d 499, 501 (8th Cir. 1990) ("Omissions of facts are not misrepresentations unless they cast doubt on the existence of probable cause."). Rather than impose an objective standard for determining whether an affiant has recklessly disregarded the truth, courts "looked to what the affiant 'believed or appropriately accepted' as true." See Clapp, 46 F.3d at 800 (quoting United States v. Leuth, 807 F.2d 719, 726 (8th Cir. 1986) (citations omitted)).

With these principles in mind, the Court now addresses defendants' contentions that Agent Robinson intentionally or recklessly included false statements in and omitted critical information from his affidavits.

The portions of the affidavit with which defendants take issue are as follows:[8]

2.      On 1/27/07 a CI approached your affiant and reported drug-dealing activity that was occurring within the City of Faribault. The CI reported that a male identified as "Mo" who resides at XXX 6th St. NW was dealing in cocaine. The CI reported that "Mo" and his associates use Mn PBPXXX and FDSXXX during their transactions. The CI said that "Mo" and his brother "AJ"

---

[8]    The supporting affidavits for the search warrants for the Central Avenue and 6th Street N.W. residences are identical. Tr. 2:98; Gov't Exs. 1, 2.

sell cocaine together. The CI said that "AJ" resides in the top floor apartment at XXXX Central Ave in Faribault.

3.	On 1/27/06 the CI called "Mo's" cell phone to arrange for a controlled drug buy. The CI spoke with a party identified as "Ismail." The CI learned that "Ismail" could provide the cocaine as "Mo" was sleeping. The CI ordered "an eight ball" (3.5 grams) of cocaine for $180.00. While your affiant was with the CI "AJ" called the CI and changed the location of the sale to Walgreen's in Faribault. Your affiant provided the CI with two one hundred dollar bills with serial numbers DB47301243C and CG33349500A. Your affiant followed the CI to Walgreen's. Your affiant watched as the CI drove into the lot and parked. A dark complected male was walking towards the front door. That male gestured at the CI. The CI then drove to the middle of the lot. A black male then exited a vehicle and walked over to the CI vehicle. The black male entered the CI vehicle and remained inside for a few minutes. Shortly after the suspect exited and walked back to the suspect vehicle. The CI left the lot. As your affiant was leaving your affiant observed the license plate of the suspect vehicle to be Mn PBPXXX. At the debrief the CI stated that when the CI pulled into the lot "AJ" was the one that motioned him to pull park in the middle of the lot. The CI stated that "Ismail" was the one that walked over to the CI vehicle and completed the transaction. Your affiant later field-tested the substance and it field tested positive for cocaine. Your affiant noted that the cocaine was in chunks and not powder. Your affiant knows by training and experience that cocaine in chunks could be coming directly off of a larger quantity of cocaine.

4.	On 1/27/07 your affiant ran the license plates of the vehicles that the CI provided the license plates on. Mn UDBXXX registered to Ahmed Hadi Aljebory of XXXX Central Ave. Your affiant obtained the DVS driver's license photo of Ahmed Hadi Aljebory.

5.	On 1/28/07 your affiant developed information that "Ismail" was Warsame Hussein Ismail 09/14/84. Your affiant went to the DVS web site and obtained the driver's license photo of Warsame Hussein Ismail.

6.	On 1/29/07 a CRI contacted your affiant with information about cocaine dealing that was occurring in the City of Faribault. This CRI had made a prior controlled purchase of cocaine and had provided your affiant with information that was verified to be true

and correct about members of the controlled substance dealing community in the SCDIU jurisdiction. The CRI made a controlled phone call to "Mo's" cell phone. "AJ" answered. The CRI arranged to purchase "an eight ball" of cocaine for $180.00. Your affiant provided the CRI with two one hundred dollar bills. They had serial numbers CF02615133A and DF15860732B. The deal was set to occur in the Walgreen's parking lot. Your affiant responded to the area and conducted surveillance. Your affiant observed what appeared to be the same black male from the previous transaction exit a vehicle and enter the CRI vehicle. The black male was in the vehicle for a brief period of time and then exited. Your affiant later did a "debrief" of the CRI. The CRI stated that the CRI had purchased the "eight ball" of cocaine from "Ismail" and that "AJ" had driven "Ismail" to the parking lot in a maroon Chevrolet Lumina. Your affiant believes that the suspect vehicle would be MN FDSXXX, which is the 1997 Chevrolet that registers to Ahmed Hadi Aljebory,

7. On 1/29/07 your affiant showed the previous obtained DVS photos to the CRI. The CRI identified "AJ" as Ahmed Hadi Aljebory and "Ismail" as Warsame Hussein Ismail. The CRI stated that Warsame Ismail and Ahmed Aljebory conducted the transaction together.

8. On 1/30/07 your affiant attempted to identify "Mo." The CRI had told your affiant that "Mo" was Ahmed Hadi Aljebory's older brother. Your affiant checked DVS records and located a Mohammed Hadi Aljebory 1/1/85. Your affiant believes that "Mo" is Mohammed Hadi Aljebory. Your affiant notes that Ahmed and Mo have the same middle and last name and that Mohammed is two years older that Ahmed.

9. On 2/2/07 your affiant spoke with a first time citizen informant who wished to provide information about drug dealing activity that was occurring in the City of Faribault. Your affiant knows the identity of this first time citizen informant. Your affiant checked in house records and was unable to observe any convictions in Rice County. The first time citizen informant called (referred to hereafter as CI) your affiant. The CI told your affiant that the CI has been at "Mo's" residence within the previous 72 hours of today's date. The CI sated [sic] that the CI had observed approximately 100 grams of cocaine, "cut," a large amount of cash and guns in the residence. The CI wanted to meet and discuss the information.

10.    On 2/2/07 your affiant and SCDIU Agent Cordova met with the CI in person. The CI arrived on time and appeared to be clear thinking and sober. The CI told your affiant that the CI had seen 100 grams of cocaine "if not more" in a plastic baggie at Mo's house within the previous 72 hours. The CI stated that the cocaine was in chunks. That would be consistent with the texture of the cocaine purchased by the first CI on 1/27/07. The CI identified "Mo" by name as Mohammed Hadi Aljebory and "AJ" as Ahmed Hadi Aljebory. Those were the same names/identities that your affiant had developed. The CI also stated that Mohammed has a 9mm or a 45 and has carried it in the past. The CI told your affiant that Mohammed carried it in public and nearly shot someone outside a local Faribault establishment recently in a dispute. The CI also stated that the CI had been at Ahmed's residence within the previous 72 hours. The CI stated that while the CI was at Ahmed's residence the CI observed ½ grams of cocaine and a sawed-off shotgun at the residence.

11.    On 2/2/07 your affiant and SCDIU Agent Cordova drove with the above CI in the City of Faribault. The CI pointed out and identified XXXX Central Ave as being Ahmed Aljebory's apartment. The CI stated that it is the upstairs unit. The CI then pointed out and identified XXX 6th St. NW as being Mohammed Aljebory's residence.

12.    During the course of this investigation your affiant observed the vehicle (Mn PBPXXX) used in the first controlled substance purchase on 1/27/07 parked at both XXXX Central Ave and XXX 6th St. NW in the City of Faribault.

Gov't Exs. 1, 2.

Defendants argue that Agent Robinson made the following false or misleading statements and omitted the following critical facts from the facts set forth in his affidavits:

- Agent Robinson's use of the abbreviation "CI" in Paragraph 2 was confusing as Agent Robinson did not define what the abbreviation meant, and he used that same term in Paragraphs 9, 10 and 11 to refer to another person who he described as a "first time citizen informant."

- Agent Robinson's reference to the CI in Paragraph 2 as a person who "approached" Agent Robinson on January 27, 2007 to report drug-related activity was misleading, when prior to Gannaway's release from the probable cause hold, Agent Robinson had approached him regarding the possibility of working as a confidential informant.

- Agent Robinson failed to include in Paragraph 2 that Gannaway had a criminal background and had recently been arrested for a felony drug offense, had signed a written agreement to cooperate with the Government, and had received cash and consideration of charges. In addition, Agent Robinson failed to include that Ismail and Gannaway had done drug sales together prior to the controlled buy on January 29, 2007.

- Agent Robinson's reference in Paragraph 6 to Gannaway as "a CRI" who had contacted Agent Robinson on January 29, 2007, was misleading because it suggested that this person constituted a second source of information, when in fact the CRI in this paragraph and the CI referenced in Paragraph 2 were the same person, Gannaway.

- Agent Robinson failed again to include in Paragraph 6 that he had not conducted a criminal history check on Gannaway, that Gannaway had a criminal background and had recently been arrested for a felony drug offense, that Gannaway had signed a written agreement to cooperate with the Government, and he had received cash and consideration of charges.

- Agent Robinson's reference in Paragraphs 9, 10 and 11 to Warsame Ismail as "a first time citizen informant" was false. Ismail was not a first time citizen informant – he was the person who sold the drugs to Gannaway during the controlled buys on January 27 and 29, and as such, was a co-conspirator of the defendants. Further, Agent Robinson failed to disclose that Ismail had never acknowledged his involvement in these sales.

- Agent Robinson's reference in Paragraph 9 that Ismail had no criminal convictions in Rice County was misleading because Agent Robinson did not also disclose that the two controlled buys by Ismail constituted two separate felony drug offenses; that Ismail had a criminal history which included an open case from Wright County for a gross misdemeanor check forgery charge stemming from an attempt to cash an unknown woman's travelers check in Faribault using Ahmed's identification and a misdemeanor assault conviction in Hennepin County; that Ismail had admitted to other prior drug deals during the January 29 controlled buy; and that Ismail had a criminal history in Wright and Hennepin Counties that he wanted to expunge.

- Agent Robinson failed to include in Paragraph 9 that he had agreed to pay Ismail 10% of any money seized from the execution of any search warrant in return for his cooperation.

- Agent Robinson's reference to "Mo's cell phone" in Paragraphs 3 and 6 for the purpose of implicating Mohammed in the controlled buys on January 27 and 29 was misleading in that Agent Robinson never investigated the subscriber of the phone, who was ultimately determined to be Ahmed, and not Mohammed.

- Agent Robinson's reference in Paragraphs 3 and 12 to the vehicle used in the January 27, 2007 controlled buy, license plate number Mn PBPXXX, as being seen as parked at both the Central Ave and 6th St. NW residences, was misleading in implicating Mohammed and Ahmed, as the car was registered to some third person, and no evidence of drug activities was observed with these vehicles at these locations.

Ahmed's Post-Hearing Mem., pp. 9-10; Mohammed's Post-Hearing Mem., pp. 5-17, 20-22.

Having reviewed the search warrant affidavits and considered all of the testimony and evidence submitted at the motions hearing, this Court concludes that the alleged misstatements in and omissions to Agent Robinson's affidavits do not rise to the level of a Franks violation, and that even if they did, when the misstatements are excluded and the omitted information is included in the affidavits, the revised affidavits would not have altered the probable cause determination.

### 1. Use of the Abbreviation "CI"

Defendants argue that the affidavits' description of the January 27, 2007 buy in Paragraph 2 is misleading because it did not define what was meant by the abbreviation "CI," a term that was used later in Paragraph 9 of the affidavits to describe Ismail. Mohammed's Post-Hearing Mem., p. 6.

In identifying Gannaway as a CI, Agent Robinson testified that he intended to indicate that Gannaway was a confidential informant, and not a citizen informant. Tr. 2:111; Tr. 3:21-22. In light of Agent Robinson's description of the information that Gannaway had provided to him on January 27, 2007, regarding defendants' involvement in the dealing of cocaine in Faribault, the vehicles they used during their transactions, and where they resided, together with his description of Gannaway's actual involvement in the controlled buy that he conducted on the same day, it was not only appropriate for him to describe Gannaway as confidential informant, but it was reasonable for Agent Robinson to assume that the reviewing judge would understand that "CI" stood for confidential informant, and that the CI identified in Paragraph 9 was a different person. At most, Agent Robinson's use of the abbreviation "CI" in Paragraph 2, without explicitly stating that it stood for "confidential informant", and his use of this same abbreviation again in Paragraph 9, amounted to negligence or a mistake, but it certainly did not rise to level of a false statement, much less one that was made with reckless disregard for the truth. Neither mere negligence nor an innocent mistake will, by themselves, void a warrant. Davis, 471 F.3d at 946 (citing Franks, 438 US. at 471; Clapp, 46 F. 3d at 799). In any event, even if the use of the abbreviation "CI" were determined to amount to a false statement that was made with knowing and intentional or reckless disregard for the truth, it is clear that had Agent Robinson explicitly informed the reviewing judge that "CI" stood for confidential informant, it would not have altered the judge's probable cause finding.

## 2. CI's Approach of Agent Robinson

Defendants contend that Agent Robinson's statement that Gannaway, the CI, approached him was misleading because it improperly implied that Gannaway had voluntarily contacted Agent Robinson without inducement to report illegal activity as a "concerned citizen" or the like. Mohammed's Post-Hearing Mem., p. 6. This contention has no merit. First, Agent Robinson's statement as written was accurate – it is a true statement that Gannaway initiated the contact with Agent Robinson regarding the information he had to share regarding defendants' drug dealings. The fact that Agent Robinson had previously given Gannaway his cell phone number and suggested a cooperative arrangement did not negate the fact that it was Gannaway who approached Agent Robinson with the information. Second, even if in hindsight it could be argued that the reviewing judge could have understood the phrase to mean that Gannaway contacted Agent Robinson "out of the blue" and without any prompting by the Government, there is nothing in the record to suggest that Agent Robinson "entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." Clapp, 46 F.3d at 801. Third, the evidence before this Court established that the omission of information was not "'clearly critical' to the finding of probable cause.'" Williams, 477 F.3d at 559. "[U]nless the government has lied to the issuing judge, the suppression issue should turn on what was in the government's affidavits, not on what defendants assert with the benefit of hindsight the government should have known." Ozar, 50 F.3d at 1145-46. Thus, at most, the use of the phrase "a CI approached your affiant," without greater explanation as to why that approach had occurred, was negligent; it was not reckless.

Finally, the Court finds that had the omitted information been included in the affidavits (i.e. that Agent Robinson approached Gannaway regarding the possibility of working as a confidential informant and gave Gannaway his cell phone number), this information would not have changed the reviewing judge's probable cause analysis. While a judicial officer may have found it interesting or useful to know what prompted a confidential informant to come forward with information, at the end of the day, the probable cause analysis is first driven by the substance of what the informant provided and then second, by the indicia of reliability and corroborative information provided in the affidavits to satisfy the reviewing judge "that there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. In this case, knowing why Gannaway provided information was not critical to that analysis.

### 3. Omission of Gannaway's Criminal Background and Cooperation Agreement

Defendants claim that Agent Robinson's omission of the criminal background of Gannaway in Paragraphs 2 and 6, including his recent arrest for a felony drug offense, as well as his written agreement to work for the Government in return for consideration of charges and cash, prevented the reviewing judge from assessing Gannaway's credibility and reliability. Mohammed's Post-Hearing Mem., pp. 7-8. Defendants also assert that despite the fact that Agent Robinson was aware that Ismail and Gannaway had transacted drug sales together prior to the controlled buy on January 29, 2007. (Tr. 3:47; Defs. Ex. 16), this information was omitted from the search warrant affidavit. Mohammed's Post-Hearing Mem., p. 21; Ahmed's Post-Hearing Mem., pp. 9-10.

Agent Robinson testified that he did not omit the specific information that Gannaway was possibly facing criminal charges in order to alter the probable cause analysis. Tr. 2:109. Rather, Agent Robinson did not feel that including the information that Gannaway had been found to have a small amount of marijuana and a pipe containing cocaine at his residence would have changed the probable cause analysis. Tr. 2:109. Agent Robinson also testified that he felt that identifying Gannaway as a CI in the search warrant indicated that Gannaway had a reason to work, and was a member of the criminal underworld. Tr. 2:111. He did not intend to give the judge reviewing the warrant application the idea that Gannaway had no motivation for working with law enforcement or no involvement with criminal activity. Tr. 2:112.

The Court does not find that Agent Robinson intentionally or recklessly omitted from his affidavits Gannaway's criminal background, prior drug deals, or any inducements he may have received for his cooperation. This is because inclusion of Gannaway's criminal background or agreement to cooperate for cash or other consideration was not clearly critical to a finding of probable cause when the information he provided, as here, was corroborated. "'Where the informant['s] information is at least partially corroborated, attacks upon credibility and reliability are not crucial to the finding of probable cause.'" United States v. Gibson, 123 F.3d 1121, 1124 (8th Cir. 1997) (quoting United States v. Humphreys, 982 F.2d 254, 259 (8th Cir. 1992)). See also Flagg, 919 F.2d at 501 (finding that "even if the confidential informant had a criminal record and was cooperating under a plea agreement, these facts are not clearly critical to the finding of probable cause," where there was partial corroboration of the information provided by the confidential informant); United States v. Parker, 836 F.2d

1080, 1083 (8th Cir. 1987) ("[W]here an informant's information is at least partly corroborated, his credibility is established and it is not necessary to notify the magistrate of the informant's criminal history.").

Here, the information that Gannaway provided to Agent Robinson was corroborated, both by Ismail and by Agent Robinson himself. Ismail, a participant in the two controlled purchases by Gannaway, confirmed Gannaway's information that two individuals named "Mo" and "AJ" were dealing cocaine in Faribault, and that their addresses were the same as the addresses Gannaway had given Agent Robinson. See United States v. Fulgham, 143 F.3d 399, 401 (8th Cir. 1998) (where "the information given by the first informant was corroborated with specific, consistent details provided by the second informant," probable cause existed). "In fact, the two informants' tips were reciprocally corroborative, rendering their information enough to support a finding of probable cause." Id. (citation omitted).

In addition, Robinson independently verified information provided to him by Gannaway. Gannaway had told Agent Robinson that Mohammed lived at XXX 6th Street N.W. and Ahmed lived at XXX Central Avenue, that Mohammed was Ahmed's older brother, and that they used cars with license plate numbers FDS-XXX and PBP-XXX in their drug dealings. Gannaway also gave information to Agent Robinson regarding a car with license plate number UDB-XXX. Agent Robinson determined that this car was registered to Ahmed Al Jebory at the Central Avenue address, which is where Gannaway had stated that Ahmed lived. Agent Robinson had also observed a car with license plate number PBP-XXX at the first of the two controlled drug buys and parked at the locations where Gannaway said defendants lived. This car was also one

of the vehicles that Gannaway had said defendants used in their drug dealings. Agent Robinson also observed at the second controlled purchase the second car that Gannaway indicated defendants used in their drug dealings, the vehicle with license plate number FDS-XXX, and determined that this car also was registered to Ahmed who he had previously confirmed lived at the Central Avenue location. Additionally, Agent Robinson found through the DVS system an entry for Mohammed Hadi Al Jebory who was two years older than Ahmed. All of this information confirmed what Gannaway had told him about Mohammed and Ahmed, their residences and the cars used in the drug activities. Finally, Agent Robinson listened to Gannaway set up the second controlled buy with AJ, and witnessed both of Gannaway's controlled drug purchases, transactions which were also recorded and transcribed. See United States v. Rivera, 410 F.3d 998, 1002 (8th Cir. 2005) (finding that where warrant omitted information that confidential informant was a long-term heroin addict who received cash payments for information, omission was not material to probable cause because his statements were corroborated by surveillance and the drugs obtained after the controlled buys).

Because the information Gannaway provided was corroborated, the omission of Gannaway's criminal background, prior drug dealings, and agreement to cooperate for cash or other consideration was not critical to a finding of probable cause. At worst, one could conclude that it was negligent for Agent Robinson to omit the information he did. "However, Franks is limited to cases of perjurious or recklessly false statements or omissions made by a police officer in support of a warrant; the rule does not apply to negligent misrepresentations or omissions." United States v. Schmitz, 181 F.3d 981, 986 (8th Cir. 1999) (citation omitted). The Court finds that Agent Robinson's omission

of Gannaway's criminal background, previous drug dealings, and cooperation arrangement did not amount to intentional or reckless conduct.

Finally, even if Agent Robinson's omission of the criminal history of Gannaway, his cooperation agreement and prior dealings with Ismail was reckless, defendants would still have to show that the affidavits would have been insufficient to establish probable cause had all of this information been included in the affidavits. Under defendants' theory, if the reviewing judge was told that the information to support a search warrant had been provided by an informant with a criminal history or who had agreed to provide the Government information in exchange for money or leniency or dismissal of charges, the judge would have refused to issue the search warrant. If this were the rule, then use of informants by law enforcement would be severely hampered, given that many informants have criminal records or are unsavory characters. See generally, United States v. King, 351 F. 3d 859, 868 (8th Cir. 2003) ("We do not dispute that it was quite likely that Kingsley's character was flawed, but we recognize, like the magistrate judge did, that the use of unsavory informants is quite often the nature of the beast in police investigations."). However, that is not the law. Judicial officers generally are not "misled by the alleged omission of facts [that the confidential informant had a criminal record and was cooperating under a plea agreement facts] . . . because informants frequently have criminal records and often supply information to the government pursuant to plea arrangements." Flagg, 919 F.2d at 501. In fact, reviewing judges are well aware that "informants are often motivated 'in the hopes of obtaining leniency with respect to their own situation [but] that does not necessarily mean they are unreliable.'" United States v. Carpenter, 422 F.3d 738, 744 (8th Cir. 2005) (quoting

<u>United States v. Gabrio</u>, 295 F.3d 880, 884 (8th Cir. 2002)).  For all of these reasons, this Court concludes that if the reviewing judge had been presented with Gannaway's criminal background, cooperation agreement with the Government, and prior dealings with Ismail, such information would not have affected the probable cause determination.

### 4.    Reference to a "CRI" in the Second Controlled Buy

Defendants assert that the description of the January 29, 2007 controlled buy detailed in Paragraph 6 of the affidavits is misleading because Agent Robinson omitted the information that the CRI in this paragraph was the same individual as the CI mentioned in Paragraphs 2 and 3, and instead created the impression that he was relying upon information provided by two separate informants.  Mohammed's Post-Hearing Mem., p. 9.

Agent Robinson testified that in Paragraph 2 of his affidavits, the CI referenced was Gannaway, and in Paragraph 6, the CRI referenced was also Gannaway.  Tr. 2:123; 3:18.  Agent Robinson further testified that he did not intend to make it appear as though there were two separate people performing controlled transactions with respect to Ahmed.  Tr. 2:123-124.  Rather, Agent Robinson stated that his intention in describing Gannaway as a CRI in Paragraph 6 was to show that he had transitioned into a CRI after successfully providing information.  Tr. 2:124-125.  According to Agent Robinson, on January 27, 2007, Gannaway was not identified as a confidential reliable informant at that time because he had not yet proven to be reliable.  Tr. 2:114.  On January 29, 2007, Gannaway's status changed from confidential informant to confidential reliable informant based upon his successful controlled buy of the cocaine on January 27, 2007, and his provision of information about a different member of the

drug dealing community that was consistent with other information Agent Robinson had received from another confidential informant.  Tr. 2:122-123.

This Court does not find Agent Robinson's statement that Gannaway was a CRI to be misleading or his failure to apprise the reviewing court that the CI and the CRI were the same individual was made with the intent to mislead or with reckless disregard of the truth.  In Paragraph 2, Agent Robinson did not include any information regarding the reliability of the CI; in Paragraph 6, Agent Robinson stated why the CRI was reliable. This is consistent with his reported attempt to show how Gannaway began as a CI and progressed to a CRI.  While Agent Robinson's reference to "a CRI" after he had just described the activities of a CI, was sloppy drafting because it could have given the reviewing judge the impression that there was a second source of information, there is no evidence before this Court to suggest that Agent Robinson had serious doubts as to the truth of his statements or obvious reasons to doubt the accuracy of the information he was providing.  See Clapp, 46 F. 3d at 801.  Therefore, the Court finds that the failure to clarify for the reviewing court that the CI and the CRI were one and the same person was neither intentional nor made with reckless disregard for the truth.

Moreover, even if the reviewing judge had been provided with the information that the CI and the CRI were the same person, probable cause for the warrant still would not have been lacking.  To the contrary, the fact that the same person had conducted both controlled buys would have increased the reliability of that individual's information.  Additionally, the fact that the controlled buys were made by one person instead of two would not negate the occurrence of the controlled buys, the observations made by Agent Robinson during the controlled buys, or the information obtained as a

result of the controlled buys.  Regardless of the identity of the informant purchasing the drugs, the individuals selling the drugs were the same for both buys.  Had the reviewing judge been presented with the information that one informant, rather than two different informants, had made two controlled buys from the same people, probable cause would still have been found.

5.  **Reference to Ismail as First-Time Citizen Informant and Omission of His Criminal Background, Previous Drug Dealings, and Payment Arrangement**

Defendants urge that Agent Robinson's description of Ismail as a first-time citizen informant in Paragraphs 9, 10 and 11 of his affidavits was an intentional false statement because Agent Robinson observed Ismail deliver drugs during the two controlled buys and therefore, knew Ismail to be a co-conspirator of defendants.  Mohammed's Post-Hearing Mem., p. 11.  Further, defendants claim that Agent Robinson's representation that Ismail had no convictions in Rice County was deliberately misleading, as was his omission of the following information: Ismail had been recently arrested on outstanding warrants and had open charges against him; Ismail had admitted to prior drug deals during the first controlled buy; Ismail had a criminal history in Wright and Hennepin Counties that he wanted to expunge; and Ismail was promised a percentage of any money seized in exchange for his cooperation.  Mohammed's Post-Hearing Mem., pp. 11-14, 23; Ahmed's Post-Hearing Mem., p. 8**.**

In his affidavits, Agent Robinson identified Ismail as a first-time citizen informant in order to protect him, and that he made a mistake in identifying Ismail as a first-time citizen informant.  Tr. 2:144, 2:146.  Agent Robinson testified that he did not intend to alter the probable cause analysis, but that he wanted to make sure Ismail was safe.  Tr.

2:147.  Agent Robinson explained that he believed that Ismail was afraid of defendants because of their gang affiliation and Mohammed's near shooting of a person in a dispute.  Tr. 2:142.  In addition, while Agent Robinson specifically stated that Ismail had no convictions in Rice County, he did not include the information that Ismail had an open criminal case and an outstanding warrant in his affidavit.  Tr. 3:59-60.  In this regard, Agent Robinson testified that he did an in-house records check in the local database which covered only Rice or Steele Counties.  Tr. 3:55.  Although this records check showed no convictions, it did reflect other contacts between Ismail and the police.  Tr. 3:55.  The first involved Ismail at a bar in Faribault where a traveler's check was found, and the second involved Ismail's January 18, 2007 arrest on outstanding warrants from Wright and Hennepin Counties.  Tr. 3:56.  The Wright County warrant was for a gross misdemeanor check forgery case stemming from the traveler's check incident, a crime of dishonesty, and the Hennepin County warrant was issued in conjunction with failure to appear on an assault case.  Tr. 3:57-58, 79.  Further, Agent Robinson knew that Ismail was seeking assistance in expunging matters in Wright and Hennepin Counties.  Tr. 2:138.  Thus, when he wrote his affidavits, Agent Robinson knew that Ismail had an open case for gross misdemeanor check forgery in Wright County and an outstanding Hennepin County warrant on an assault case, yet he did not include that information in the affidavits.  Tr. 3:59.  Agent Robinson acknowledged that, although it was not his intent, the reviewing judge was prevented from being able to assess the credibility of Ismail due to the omissions regarding his criminal record.  Tr. 3:79-80.

Agent Robinson also admitted that he did not disclose Ismail's discussion with Gannaway regarding prior drug dealings during the first controlled drug buy or that Ismail had been promised 10% of any money seized from the execution of the search warrants in return for his cooperation. Tr. 3:79, 107, 124.

The Court understands that Agent Robinson's objective in describing Ismail as a first time citizen informant was to protect him because he was afraid of defendants. In facts very similar to the instant case, the Eighth Circuit held that the concealment of the identity of a person involved in the drug transactions at issue, by labeling him a "third unnamed confidential informant," was not a false statement within the contemplation of Franks when the omission was intended not to enhance the contents of the affidavit but to protect the informant. See United States v. Strini, 658 F.2d 593, 596-97 (8th Cir. 1981). Here, however, Agent Robinson went further. In addition to masking Ismail's true identity by characterizing him as a first time citizen informant and informing the reviewing judge that Ismail had no convictions in Rice County, the judge could easily have concluded that Ismail was a non-criminal member of society, when in fact, that was not true.

Nevertheless, this Court finds that the omission of Ismail's unsavory character (as exemplified by his criminal background and past drug dealings) and the cooperation agreement did not rise to the level of a Franks violation, because the missing information was not clearly critical to the finding of probable cause. To the contrary, as with Gannaway, Ismail's credibility was established by the corroboration of the information he provided by both Gannaway and Agent Robinson. See Section II.A.3, supra (concluding that where an informant's information is at least partly corroborated,

his credibility is established and it is not necessary to notify the magistrate of the informant's criminal history). Further, the reliability of the information provided by Ismail was enhanced based on his recent first-hand observations and Agent Robinson's opportunity to evaluate Ismail in person. See Adams v. Williams, 407 U.S. 143, 146-47 (1972) (finding that the credibility of the informant is enhanced when the informant is subject to immediate arrest for making a false complaint); United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (finding sufficient probable cause where informant had personally discovered evidence of a crime and provided police with a detailed description) (citing Florida v. J.L., 529 U.S. 266, 270 (2000)) (explaining that "a known informant . . . can be held responsible if her allegations turn out to be fabricated") and citing United States v. Jackson, 898 F.2d 79, 81 (8th Cir. 1990) (finding adequate basis of informant's knowledge where anonymous informant's tip provide the "richness and detail of a first hand observation")); Gabrio, 295 F.3d at 883 (concluding that an informant's information was reliable in part because "[t]he tip here was timely and 'based on the informant's first-hand observations, not merely from rumor or innuendo,'" and the affiant "had an opportunity to assess the informant's credibility because he gave his tip in person.") (citations omitted); United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996) ("personal contact with an informant can strengthen an officer's decision to rely on the information provided"); Williams, 10 F.3d at 594 (finding informant's information credible because it was based on his first-hand observations, not merely from rumor or innuendo."). Providing the tip in person to Agent Robinson allowed him to assess the credibility of Ismail.

However, even if the false statement that Ismail was a first-time citizen informant was deleted from the affidavit,[9] and the affidavits had instead labeled him a "co-conspirator," included all of the information regarding Ismail's involvement in the controlled drug buys, past drug transactions, his criminal background, and cooperation agreement, the warrant would have still contained probable cause. If anything, the information that Ismail had been directly involved in the transactions with Ahmed would have bolstered his credibility and the perceived accuracy of his information. It would have explained to the reviewing judge why Ismail was in a position to know the sources of the drugs he was selling, where the sources resided, and where they kept their drugs and other evidence associated with drug dealings. It also would have lent credibility to Ismail's firsthand observations of the contraband that he reported seeing in the residences that were the subject of the search warrants.

By concluding that Agent Robinson's conduct does not rise to the level of a Franks violation, this Court does not mean to suggest that it is condoned, because it is not. Agent Robinson's description of Ismail and selective description of his criminal background was misleading to the reviewing judge. Agent Robinson could have just as easily protected Ismail's identity by referring to him as another confidential informant. Furthermore, it would have been more forthright for Agent Robinson to omit mention of Ismail's criminal history entirely rather than selectively describe it as he did here.

---

[9] Any suggestion by defendants that the remedy for Agent Robinson's false statement regarding Ismail's true identity should be the deletion in their entirety of all references to him and the information he provided to Agent Robinson, is rejected. The "falsity" related to the identity of the informant, and it is that which would be set aside. See Strini, at 597. The court would then have to decide whether based on the information given to the affiant by an "unnamed informant" there was sufficient information remaining in the affidavit to establish probable cause. Id.

However, like the <u>Strini</u> court, despite this Court's dislike of Agent Robinson's conduct, the Court finds that it does not mandate the suppression of the search warrants.  <u>See Strini</u>, at 598.

### 6. Reference to "Mo's Cell Phone"

Defendants argue that Agent Robinson's statements in Paragraphs 3 and 6 that "Mo's cell phone" was being used to arrange the drug transactions was made with reckless disregard for the truth because the basis for these statements was Gannaway's comments that he had called Mo's cell phone, and not an investigation into the actual owner or subscriber of the phone.  Mohammed's Post-Hearing Mem., pp. 14-15.  According to defendants, these statements misled the reviewing judge into believing that phone belonged to Mohammed, when it was actually subscribed to by Ahmed.  <u>Id</u>., p. 15.  Defendants argue that this is of particular consequence because the cell phone played a substantial part in creating the nexus between Mohammed and the drug transactions.  <u>Id</u>.

The Court does not find that the inclusion of the statements that the Gannaway called Mo's cell phone to be made with reckless disregard for the truth.  Gannaway told Agent Robinson that he was calling Mo's cell phone.  Although Agent Robinson did not attempt to determine the owner or subscriber of the phone, he was not given any reason to believe that the phone belonged to someone else.  Tr. 2:126.  Agent Robinson stated that he felt he did not need to obtain the information because the phone calls were successful, and he trusted that Gannaway was telling him that was the phone number used to reach Mohammed.  Tr. 3:41.  Additionally, Agent Robinson testified that in his experience, people who are jointly involved in drug dealing activities

often use a single business phone.  Tr. 3:138.  An officer "may rely upon information received through an informant…so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge," <u>Gates</u>, 462 U.S. at 241 (quoting <u>Jones v. United States</u>, 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)).

The issue presented by defendants' suppression motions is whether there was probable cause to believe that contraband or evidence of a crime would be found at the Central Avenue and 6th Street N.W. residence, not whether there was sufficient evidence to believe that Mohammed was involved in illegal activities.  The identity of the owner or subscriber was not critical to that probable cause analysis.  <u>See</u> <u>Rivera</u>, 410 F.3d at 1001 (finding that affiant's statement in the search warrant regarding defendant's pager number falsely implied that the affiant had actual knowledge of the pager number, was not material to probable cause "[p]rimarily because the subsequent controlled buys demonstrated the reliability of the pager number.").  Here, Gannaway's information that he was calling Mo's cell phone was corroborated by the fact that the calls were successful and resulted in the controlled drug buys.  Therefore, even if the warrant affidavits had described the phone calls made by Gannaway without any reference to the owner or subscriber of the phone, the affidavits still would be found to contain probable cause.

### 7.    Reference to Vehicle Used in First Controlled Buy

Finally, defendants argue that Agent Robinson misled the reviewing judge when he stated in Paragraph 12 of his affidavits that he observed the same vehicle used in the January 27, 2007 controlled buy, license plate number MN PBP-XXX, to be parked

at each of the residences which were later searched. According to defendants, this statement was misleading because it was clear in Paragraph 3 of the affidavits that Ismail was the only person seen in the vehicle on January 27, 2007, and the vehicle was actually registered to a person not believed to be connected with this case. Mohammed's Post-Hearing Mem., p. 16. The Court does not find this information to be misleading. Whether Ismail was the only person seen in the vehicle on January 27, 2007, or to whom the vehicle belonged, the fact is that Ahmed was seen at the scene of the drug transaction, and the vehicle was seen at both the drug transaction and at the defendants' houses, all of which linked the car, the drug sale and the places to be searched. Agent Robinson's statement was factual in nature. If, as defendants contend, it was clear in Paragraph 3 that Ismail was the only person seen in the vehicle, then a reviewing judge had the opportunity to assess that information. The information regarding the car was not misleading.

In summary, even if the defendants had established that Agent Robinson knowingly and intentionally, or with reckless disregard for the truth, had included false information in or excluded material information from his search warrant affidavits, this Court finds that when the alleged false statements are excluded and the missing information is added back into the affidavits, the affidavits still support a finding of probable cause for the search warrants. In this regard, the affidavits would read as follows, or to similar effect:

> 2.      On 1/27/07 a CI (confidential informant) approached your affiant and reported drug-dealing activity that was occurring within the City of Faribault.  Your affiant had previously approached this CI and suggested a cooperative informant arrangement subsequent to the CI's arrest on a different matter.  Your affiant knows this CI to have a criminal history involving narcotics.  This CI is working as an

informant for consideration of pending charges and for cash.  The CI reported that a male identified as "Mo" who resides at XXX 6th St. NW was dealing in cocaine.  The CI reported that "Mo" and his associates use Mn PBPXXX and FDSXXX during their transactions.  The CI said that "Mo" and his brother "AJ" sell cocaine together.  The CI said that "AJ" resides in the top floor apartment at XXXX Central Ave in Faribault.

3.     On 1/27/06 the CI called "Mo's" cell phone to arrange for a controlled drug buy.  <u>Your affiant does not know who actually owns this phone or the subscriber of the phone</u>.  The CI spoke with a party identified as "Ismail."  The CI learned that "Ismail" could provide the cocaine as "Mo" was sleeping.  The CI ordered "an eight ball" (3.5 grams) of cocaine for $180.00.  While your affiant was with the CI "AJ" called the CI and changed the location of the sale to Walgreen's in Faribault.  Your affiant provided the CI with two one hundred dollar bills with serial numbers DB47301243C and CG33349500A.  Your affiant followed the CI to Walgreen's.  Your affiant watched as the CI drove into the lot and parked.  A dark complected male was walking towards the front door.  That male gestured at the CI.  The CI then drove to the middle of the lot.  A black male then exited a vehicle and walked over to the CI vehicle.  The black male entered the CI vehicle and remained inside for a few minutes.  Shortly after the suspect exited and walked back to the suspect vehicle.  The CI left the lot.  As your affiant was leaving your affiant observed the license plate of the suspect vehicle to be Mn PBPXXX.  At the debrief the CI stated that when the CI pulled into the lot "AJ" was the one that motioned him to pull park in the middle of the lot.  The CI stated that "Ismail" was the one that walked over to the CI vehicle and completed the transaction.  Your affiant later field-tested the substance and it field tested positive for cocaine.  Your affiant noted that the cocaine was in chunks and not powder.  Your affiant knows by training and experience that cocaine in chunks could be coming directly off of a larger quantity of cocaine.

4.     On 1/27/07 your affiant ran the license plates of the vehicles that the CI provided the license plates on.  Mn UDBXXX registered to Ahmed Hadi Aljebory of XXXX Central Ave.  Your affiant obtained the DVS driver's license photo of Ahmed Hadi Aljebory.

5.     On 1/28/07 your affiant developed information that "Ismail" was Warsame Hussein Ismail 09/14/84.  Your affiant went to the DVS web site and obtained the driver's license photo of Warsame Hussein Ismail.

6.　　On 1/29/07 a CRI, who is the same person as the CI described in paragraphs 2 and 3, contacted your affiant with information about cocaine dealing that was occurring in the City of Faribault. This CRI had made a the prior controlled purchase of cocaine and had provided your affiant with information that was verified to be true and correct about members of the controlled substance dealing community in the SCDIU jurisdiction. The CRI informed your affiant that he made a controlled phone call to "Mo's" cell phone. "AJ" answered. The CRI arranged to purchase "an eight ball" of cocaine for $180.00. Your affiant provided the CRI with two one hundred dollar bills. They had serial numbers CF02615133A and DF15860732B. The deal was set to occur in the Walgreen's parking lot. Your affiant responded to the area and conducted surveillance. Your affiant observed what appeared to be the same black male from the previous transaction exit a vehicle and enter the CRI vehicle. The black male was in the vehicle for a brief period of time and then exited. During this encounter, the CRI and other male discussed previous drug dealings they had conducted at this location. Your affiant later did a "debrief" of the CRI. The CRI stated that the CRI had purchased the "eight ball" of cocaine from "Ismail" and that "AJ" had driven "Ismail" to the parking lot in a maroon Chevrolet Lumina. Your affiant believes that the suspect vehicle would be MN FDSXXX, which is the 1997 Chevrolet that registers to Ahmed Hadi Aljebory,

7.　　On 1/29/07 your affiant showed the previous obtained DVS photos to the CRI. The CRI identified "AJ" as Ahmed Hadi Aljebory and "Ismail" as Warsame Hussein Ismail. The CRI stated that Warsame Ismail and Ahmed Aljebory conducted the transaction together.

8.　　On 1/30/07 your affiant attempted to identify "Mo." The CRI had told your affiant that "Mo" was Ahmed Hadi Aljebory's older brother. Your affiant checked DVS records and located a Mohammed Hadi Aljebory 1/1/85. Your affiant believes that "Mo" is Mohammed Hadi Aljebory. Your affiant notes that Ahmed and Mo have the same middle and last name and that Mohammed is two years older that Ahmed.

9.　　On 2/2/07 your affiant spoke with a first time citizen informant Ismail, who wished to provide information about drug dealing activity that was occurring in the City of Faribault. Your affiant knows the identity of this first time citizen informant. Your affiant checked in house records and was unable to observe any convictions in Rice County. However, your affiant knows that Ismail was involved in the two controlled drug buys, that he has previously

engaged in drug transactions with the first CI, and that he has open criminal cases in Wright and Hennepin Counties. ~~The first time citizen informant~~ Ismail called ~~(referred to hereafter as CI)~~ your affiant. ~~The CI~~ Ismail told your affiant that ~~the CI~~ he has been at "Mo's" residence within the previous 72 hours of today's date. ~~The CI~~ Ismail stated that ~~the CI~~ he had observed approximately 100 grams of cocaine, "cut," a large amount of cash and guns in the residence. ~~The CI~~ Ismail wanted to meet and discuss the information.

10.     On 2/2/07 your affiant and SCDIU Agent Cordova met with ~~the CI~~ Ismail in person. ~~The CI~~ Ismail arrived on time and appeared to be clear thinking and sober. ~~The CI~~ Ismail told your affiant that he had seen 100 grams of cocaine "if not more" in a plastic baggie at Mo's house within the previous 72 hours. ~~The CI~~ Ismail stated that the cocaine was in chunks. That would be consistent with the texture of the cocaine purchased by the first CI on 1/27/07. ~~The CI~~ Ismail identified "Mo" by name as Mohammed Hadi Aljebory and "AJ" as Ahmed Hadi Aljebory. Those were the same names/identities that your affiant had developed. ~~The CI~~ Ismail also stated that Mohammed has a 9mm or a 45 and has carried it in the past. ~~The CI~~ Ismail told your affiant that Mohammed carried it in public and nearly shot someone outside a local Faribault establishment recently in a dispute. ~~The CI~~ Ismail also stated that ~~the CI~~ he had been at Ahmed's residence within the previous 72 hours. ~~The CI~~ Ismail stated that while ~~the CI~~ he was at Ahmed's residence ~~the CI~~ he observed ½ grams of cocaine and a sawed-off shotgun at the residence. In exchange for the information, Ismail requested assistance in expunging some criminal matters. Your affiant is also authorized to offer Ismail 10% of any cash seized as payment.

11.     On 2/2/07 your affiant and SCDIU Agent Cordova drove with ~~the above CI~~ Ismail in the City of Faribault. ~~The CI~~ Ismail pointed out and identified XXXX Central Ave as being Ahmed Aljebory's apartment. ~~The CI~~ Ismail stated that it is the upstairs unit. ~~The CI~~ Ismail then pointed out and identified XXX 6th St. NW as being Mohammed Aljebory's residence.

12.     During the course of this investigation your affiant observed the vehicle (Mn PBPXXX) used in the first controlled substance purchase on 1/27/07 parked at both XXXX Central Ave and XXX 6th St. NW in the City of Faribault. PBPXXX is registered to a third person not involved with this case.

The warrant, as written above, clearly supports probable cause to search the residences of both Mohammed and Ahmed Al Jebory. Given the detailed information provided by both Gannaway and Ismail, their own involvement in the controlled drug buys and knowledge of the sources of the drugs, and Agent Robinson's own observations and investigation, a reasonable person could believe that there was a fair probability that contraband would be found at the Central Avenue and 6th Street N.W., the residences of Mohammed and Ahmed. An informant's reliability, veracity, and basis of knowledge are highly relevant to the probable cause determination, but are not "independent requirements to be rigidly exacted in every case...." Gates, 462 U.S. at 230. While the inclusion of the omitted information, including the criminal histories of Gannaway and Ismail, could have cast doubt on the their reliability, this Court concludes that the information they provided was significantly corroborated, and therefore, the determination of probable cause would remain largely unaffected by the additional information. Accordingly, it is recommended that defendants' motion to suppress evidence be denied.

**B.    Mohammed Al Jebory's Motion to Suppress Statements**

Mohammed moved for suppression of his statement after his arrest solely on the basis that the statement was the fruit of an unlawful search and seizure.[10] Because the Court has found that the search and seizure in this case was lawful, the motion is consequently denied.

---

[10]    Mohammed Al Jebory conceded that the totality of the circumstances in this case were insufficient to support a claim that the statements he made subsequent to his arrest were not knowing or voluntary. Mohammed Post-Hearing Mem., p. 25. With regard to any alleged spontaneous utterances made during his arrest, Mohammed stated that the issue is factual and would be addressed at trial, if necessary. Id., p. 26.

## C.    Ahmed Al Jebory's Motion to Suppress Statements

Ahmed has filed a general motion to suppress statements, but did not make any argument in reference to that motion in his memorandum filed with the Court subsequent to the motions hearing.  As such, all this Court has before it is the boiler plate arguments he submitted to the Court in connection with his motion, i.e. that any statements were given in violation of his Fourth, Fifth and Sixth Amendment rights, and were not knowingly and voluntarily given.  Ahmed's Mot. to Suppress, p. 1 [Docket No. 33].

Miranda v. Arizona requires that an individual be advised of his right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning.  Miranda v. Arizona, 384 U.S. 436, 444 (1966); see also United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990).  Therefore, the protections afforded by Miranda are triggered when an individual "is both in custody and being interrogated."  United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (citing United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir. 1992)).

As a preliminary matter, the Court notes that there is no dispute that Ahmed was in custody at the time the statements were made, and that he was therefore entitled to a reading of his Miranda rights.  Further, it is evident from the record that Ahmed was properly given his Miranda rights.  Tr. 2:163; Gov't Ex. 7; Gov't Ex. 8, p. 1.  Thus, the only issue that remains for determination is whether Ahmed validly waived those rights.

A waiver of Miranda rights is valid if it satisfies the following criteria:  "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second,

the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (citing United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994)).  "The determination of whether an accused has knowingly and voluntarily waived his Miranda rights depends on all the facts of each particular case." Stumes v. Solem, 752 F.2d 317, 320 (8th Cir. 1985) (citing Fare v. Michael C., 442 U.S. 707, 724-25 (1979)).  Only if the "'totality of the circumstances surrounding the interrogation'" reveals both an uncoerced choice and the requisite level of comprehension may this Court properly conclude that the defendant's Miranda rights have been waived.  See Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Fare, 442 U.S. at 725).

Here, there are no facts to indicate that Ahmed's waiver was not the product of free choice, and Ahmed has offered nothing to suggest that his Miranda rights were waived involuntarily, or that he was coerced into the waiver.

A recording of Ahmed's interview was submitted to the Court as Government's Exhibit 7.  The Court has listened to that interview in its entirety.  Ahmed's interview was relatively brief, lasting just over thirteen minutes.  At the beginning of the interview, Agent Robinson clearly read Ahmed his Miranda rights, and Ahmed clearly acknowledged that he understood each right.  Ahmed then agreed to talk to Agent Robinson.  At no time during the interview did Ahmed indicate that he was uncomfortable or that he needed anything.  The circumstances surrounding defendant's interview were not coercive or intimidating in any manner.

Approximately seven minutes into the interview, the following exchange took place:

> Q:   So, we'll, we'll get to that here in a second.  So you, you help your brother out by running some of the cocaine to his customers?  Would that be fair to say?  And then you take the money back to your brother?  Ok you're not saying anything now.

> A:   Yeah cause I have no more to say.

> Q:   You don't have no more to say?  Ok.  Let's switch, let's switch on that topic.  Let's change topics.  Ok the Harley Davidson motorcycle that was in the living room.

> A:   Mm-hmm (yes).

> Q:   One of the funniest things I've ever seen, a motorcycle sitting in the middle of a living room of a house in the wintertime.  Um,

> A:   That I don't know nothing about.

Gov't Ex. 8, p. 4-5.  Ahmed then proceeded to answer further inquires until the interview was concluded.  Tr. 2:165; Gov't Ex. 8, pp. 5-9.

To the extent that Ahmed is claiming that he invoked his right to remain silent at this point during his interview, the claim is unsubstantiated.  Ahmed continued to talk to Agent Robinson for another six minutes or so.  The Court recognizes that a waiver of <u>Miranda</u> rights does not need to be explicit.  The Constitution does not require that officers obtain an affirmative answer to a question such as "do you waive these rights" in order to find waiver of <u>Miranda</u> rights.  <u>See</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979).  Instead, a <u>Miranda</u> waiver may be implied from the totality of the circumstances.  <u>Id</u>. at 373-76.  Further, a defendant's willingness to answer questions after acknowledging his <u>Miranda</u> rights is sufficient to constitute an implied waiver.  <u>See</u> <u>Burket v. Angelone</u>, 208 F.3d 172, 198 (4th Cir. 2000); <u>see</u> <u>also</u> <u>United States v.</u>

Mandujano, No. CR. 03-178(2) (JRT/FLN), 2003 WL 22076577 at *4 (D. Minn. Aug. 22, 2003) ("Waiver can be inferred by conduct, and a willingness to answer questions after acknowledging Miranda rights is sufficient to constitute an implied waiver.") (citations omitted).   Here, Ahmed explicitly waived his Miranda rights at the beginning of the interview, and began to answer questions.   Approximately seven minutes later, he stated that he had no more to say on a particular topic, and then continued to answer questions for another six minutes.   The Court finds that Ahmed's willingness to continue answering questions after stating that he had no more to say constitutes an implied waiver.

Additionally, questions asked at the hearing on the motions implied that English was not Ahmed's first language, and that he may have been under the influence of drugs or alcohol at the time of his arrest.   Regarding any alleged language obstacles, Ahmed never asked for a translator.   Both Agent Robinson and Agent Cordova testified that Ahmed had no trouble understanding the questions asked of him and replying in English to those questions, and no accent or difficulty speaking English is discernible on the recording of Ahmed's interview.   With respect to any contention that Ahmed was under the influence of drugs or alcohol at the time of his interview, the medical questionnaire completed by the Rice County Jail and Annex stated that Ahmed was conscious and alert, that he did not appear to be under the influence of alcohol or drugs, and there were no signs of alcohol or drug withdrawal symptoms.   See Gov't Ex. 6. Furthermore, both Agent Cordova and Agent Robinson testified that Ahmed did not appear to be under the influence, and that he made no complaints regarding his physical condition.

Having found that defendant's arrest was valid, and based upon the lack of evidence to the contrary, the Court finds that defendant's <u>Miranda</u> rights were validly waived. Therefore, defendant's motion to suppress statements should be denied.

## RECOMMENDATION

For the reasons set forth above, it is recommended that:

1.      Defendant Mohammed Hadi Al Jebory's Motion to Suppress Confessions and Statements [Docket No. 19] be DENIED.

2.      Defendant Mohammed Hadi Al Jebory's Motion to Suppress Fruits of Search and Seizures [Docket No. 27] be DENIED.

3.      Defendant Ahmed Hadi Al Jebory's Motion to Suppress Statements [Docket No. 33] be DENIED.

4.      Defendant Ahmed Hadi Al Jebory's Motion for Suppression of Search and Seizure Evidence [Docket No. 41] be DENIED; and

5.      Defendants' Joint Motion for <u>Franks</u> Hearing [Docket No. 55] be GRANTED.


Dated:      November 30, 2007


*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before December 14, 2007 a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.